UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| APEX BILLING SOLUTIONS, LLC, § § Plaintiff, § § v. § § STARNIK SYSTEMS, INC., § § Defendant. § | No. 5:19-CV-00173-H |

## MEMORANDUM OPINION AND ORDER

Plaintiff Apex Billing Solutions, LLC, seeks a temporary restraining order requiring Defendant Starnik Systems, Inc., to restore Apex's access to utility-billing software that Starnik has licensed to Apex under contract. Starnik apparently terminated Apex's access to the software because it believes Apex breached the contract's non-assignment provision. Apex claims that Starnik's refusal to restore Apex's access to the software violates Section 5(B) of the parties' Application Services Agreement, which provides for a 21-day period that Apex views as an unconditional period in which it may cure any breach. Despite Apex's thorough briefing and supporting declarations, the Court denies the motion because Apex cannot satisfy its heavy burden of showing a substantial likelihood of success on the merits and a substantial threat of irreparable harm absent a restraining order.

1.  **Background**

    A.  **Parties**

    Apex is a Georgia limited liability company with its principal place of business in Columbus, Georgia. Apex's business involves the provision of billing, collection, and reimbursement services for its customers.

Starnik is a Texas corporation with its principal place of business in Lubbock, Texas. Starnik is a licensor of utility billing software.

### B.     Factual History

On August 20, 2009, Apex and Starnik entered into an Application Services Agreement under which Starnik agreed to license utility billing software to Apex. Compl. ¶ 12. Section 5(B) of the Agreement provides that either party "may terminate this agreement for material breach by the other party by providing notice to the breaching party, which termination shall occur automatically if such breach is not cured within a period of twenty-one (21) days following such notice." Thompson Decl. Ex. A at Section 5(B). Section 5(B) also states that "[t]ermination for breach will not preclude the terminating party from exercising any other remedies for breach." *Id.* The Agreement also contains a non-assignment provision that requires Apex to obtain permission from Starnik before Apex may assign its rights under the contract, and the non-assignment provision expressly states that changes in the control of Apex are considered assignments. *Id.* at Section 13.

On August 8, 2019, Conservice acquired all of Apex's outstanding equity interests. Apex claims that, as a business entity, it continues to exist and function in the same capacity. Compl. ¶ 14. On August 15, 2019, Starnik sent Apex a Notice of Breach of Contract, stating that Conservice's acquisition of Apex constituted a "material breach" that entitled Starnik to terminate the Agreement. *See* Thompson Decl., Ex. C. Starnik's Notice of Breach of Contract stated that "[i]n the event that we are unable to come to an agreement with Apex concerning cure of the Breach prior to such time, the Agreement will automatically terminate 21 days following Apex's receipt of this Notice of Breach of Contract." *Id.*

Apex claims that the parties then commenced a period of unsuccessful attempts to resolve the dispute, which culminated in a phone call between Conservice and Starnik on August 16, 2019. Compl. ¶ 22. Apex alleges that, during this phone call, Starnik requested an upfront payment of $3 million in exchange for the restoration of access to the software, and Apex refused Starnik's offer. *Id.* Apex further claims that Starnik failed to make its attorneys available for discussions aimed at resolving the dispute. *Id.* at ¶ 23.

Apex alleges that, after the call ended, Starnik blocked Apex and its customers from accessing the licensed software. *Id.* at ¶ 24. Subsequently, Apex sent Starnik a letter requesting that Starnik restore Apex's access. *See* Thompson Decl., Ex. C. Apex claims that Starnik has not responded to that letter. Compl. ¶ 26.

Apex alleges that, as of August 19, 2019, Apex employees are unable to "bill, run reports, post payments, run automated clearing house functions, or complete moveout bills" and that Apex customers are having difficulty logging onto the system. *Id.* at 27. Per Apex's complaint, Starnik's failure to restore Apex's access to the licensed software has left over 450 property owners, over 50,000 households, and several major corporations unable to pay their bills. *Id.* at ¶ 25. Apex further alleges that Starnik's actions have subjected many utilities and property owners to potential violations of ordinances requiring timely billing. *See* Plaintiff's Brief at 5–6.

## 2.     Legal Standards

A federal court may issue a temporary restraining order without notice to the adverse party only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing

any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(A)-(B).

Additionally, a movant seeking preliminary injunctive relief must establish (1) "a substantial likelihood that the movant will prevail on the merits"; (2) a "substantial threat that irreparable harm will result if the injunction is not granted"; (3) a "threatened injury [to the movant that] outweighs the threatened harm to the defendant"; and (4) that "the granting of the preliminary injunction will not disserve the public interest." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). The same criteria are applicable to temporary restraining orders. *See May v. Wells Fargo Home Mortg.*, 2013 WL 2367769, at *1 (N.D. Tex. May 30, 2013) (Fitzwater, C.J.) (quoting *Asadoorian v. Travis*, 2011 WL 2224984, at *1 (D. Mass. June 7, 2011)).

A preliminary injunction is "an extraordinary remedy, not available unless the plaintiff carries his burden of persuasion as to all of the four prerequisites." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Preliminary injunctions are "not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Jones v. Bush*, 122 F. Supp. 2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (unpublished). "The decision to grant a preliminary injunction 'is to be treated as the exception rather than the rule.'" *Id.* (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985) (stating that movant must "clearly carr[y] the burden of persuasion")). "'The decision whether to grant a preliminary injunction is within the discretion of the court, but it is an extraordinary remedy that should only be granted if the movant has clearly carried its burden.'" *John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, 861 F. Supp. 2d 792, 794 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *TGI*

4

*Friday's, Inc. v. Great Nw. Rest., Inc.*, 652 F. Supp. 2d 763, 767 (N.D. Tex. 2009) (Fitzwater, C.J.)). Its primary purpose is "to preserve the court's ability to render a meaningful decision after a trial on the merits." *Callaway*, 489 F.2d at 573.

3. **Analysis**

   A. **Substantial Likelihood of Prevailing on the Merits**

   To demonstrate a substantial likelihood of success on the merits, Apex "must present a prima facie case but need not show that [it] is certain to win." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure § 2948.3 (2d ed. 1995)). In making its determination, the Court refers to "the standards provided by the substantive law." *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990) (citation omitted).

   Apex argues that the question of whether the transaction between Apex and Conservice constituted a material breach is properly addressed to the finder of fact. Additionally, Apex contends that it has a substantial likelihood of prevailing on the merits of its claim that the Agreement remained in full force during the 21-day period provided for in Section 5(B) of the Agreement. *See* Thompson Decl. Ex. A at Section 5(B). Apex refers to the 21-day period as a timeframe during which a breaching party unambiguously retained the right to cure a material breach, and it argues that Starnik's words and actions demonstrate that Starnik's interpretation of the 21-day period was identical to Apex's understanding. *See* Apex Billing Solutions' Brief in Support of its Emergency Motion for an Ex Parte Temporary Restraining Order ("Plaintiff's Brief") at 3–4. The Court, however, is not persuaded that Apex has demonstrated a sufficiently high likelihood of success to merit

an ex parte temporary restraining order because a plausible interpretation of the Agreement would allow Starnik to withhold performance before the 21-day period had expired.

Apex's likelihood of success on the underlying contention that it did not materially breach its contract with Starnik by transferring control of its business to Conservice is uncertain. The Agreement includes a non-assignment provision, which states that Apex lacked the right to assign or otherwise transfer its rights and obligations under the Agreement to another party, including through a change in control, without prior written consent from Starnik. Thompson Decl. Ex. A at Section 13. As Apex recognizes, Apex arguably breached the contract when it signaled its continued intent to assign its rights under the Agreement to Conservice. While Apex correctly notes that the materiality of a breach is a question for the finder of fact, the mere establishment of a triable issue of fact falls short of the standard for entitlement to preliminary injunctive relief. *See Callaway*, 489 F.2d at 576.

Apex's argument that it is likely to succeed on the merits rests more firmly on its contention that the 21-day period provided under the Agreement gives an opportunity to cure even if Apex's business transaction with Conservice constitutes a material breach. The Agreement provides that either party may terminate the contract for material breach "by providing notice to the breaching party, which termination shall occur automatically if such breach is not cured within a period of twenty-one (21) days following such notice." Thompson Decl. Ex. A at Section 5(B). Apex contends on this basis that "plain language thus confirms that the Agreement remains in full effect for 21 days after notice of a material breach is given." Plaintiff's Brief at 10.

A close reading of the contract's termination provision, however, reveals two plausible interpretations. On the one hand, as Apex urges, the "which" clause could be restrictive—defining the only method of termination and providing an unqualified 21-day cure period. Starnik's letter to Apex regarding Apex's alleged breach arguably supports this interpretation because it references the contract's automatic-termination provision "[i]n the event that we are unable to come to an agreement with Apex concerning cure of the Breach prior to such time." *See* Thompson Decl. Ex. C.

On the other hand, a plausible alternative reading is that the 21-day period provides only for a deadline, the passage of which triggers automatic termination, rather than allowing the breaching party an ironclad opportunity during which to cure. The primary portion of the termination provision states unequivocally that "[e]ither party may terminate this agreement for material breach by the other party by providing notice to the breaching party." The remainder of the termination provision could plausibly be read to create an additional means of termination—automatic termination 21 days after notice if the breach is not cured—but not an unlimited to right to cure. After all, it is foreseeable that parties to a contract such as the one in dispute here could attempt to resolve the dispute but reach an impasse before the expiration of the 21-day period. Would the aggrieved party be forced to allow the 21-day period to expire despite knowing that the breaching party would not cure the breach, or could it give notice of termination? The Court views the latter possibility at least a plausible interpretation.

Finally, Apex's interpretation arguably violates the surplusage canon of construction. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174, 176 (2012). If the sole means of terminating the contract is after a 21-day cure period, the

word "automatically" arguably becomes unnecessary. Apex's interpretation fails to address the parties' purpose in including the word "automatically," and courts ordinarily do not presume that a contractual term has no effect. *See id.*

Apex urges that Starnik "understood that the Agreement provided Apex 21 days to cure its alleged breach and that the Agreement was continuing during the 21-day cure period." Plaintiff's Brief at 4. Yet the sole evidence for this proposition is Starnik's statement that "[i]n the event that we are unable to come to an agreement with Apex concerning cure of the Breach prior to such time, the Agreement will automatically terminate 21 days following Apex's receipt of this Notice of Breach of Contract." Thompson Decl. Ex. C. Starnik's statement, however, is not necessarily inconsistent with the alternative reading of the Agreement, under which the 21-day provision merely initiates a period at the expiration of which the Agreement automatically terminates.

The Court is also mindful of the differences between the Agreement's language regarding the 21-day period and contract language that unambiguously provides for an unqualified cure period. For instance, a contract might provide a party with the right to terminate a contract subject to an explicitly labeled "cure period" or expressly condition termination on the breaching party's failure to cure within a specified period. In *Ryan, LLC v. Inspired Dev., LLC*, for example, the contract provided that "[i]n the event Inspired fails to provide such facilities or perform services as required [by the Marketing Agreement], as determined appropriate by Ryan, Ryan shall, after providing Inspired with notice as required [by the Marketing Agreement] and subject to a sixty (60) day cure period, have the option of providing such facilities and services." No. 3:12-CV-02391-O, 2013 WL 12137012, at *4 (N.D. Tex. July 18, 2013) (O'Connor, J.). Similarly, in *Made2Manage Sys.,*

*Inc. v. ADS Info. Sys., Inc.*, the contract made clear that "[t]his Agreement may only be terminated upon written notice if ADS commits a breach hereof and fails to cure such within thirty (30) days after written notice of the breach from M2M." No. 1:02-CV-1405-LJM-WTL, 2003 WL 21508235, at *2 (S.D. Ind. June 24, 2003); *see also Nasyrova v. Immunomedics, Inc.*, No. CIV.A. 14-1269 SRC, 2015 WL 4388310, at *1 (D.N.J. July 15, 2015) ("Any such termination shall become effective at the end of such [cure period] unless the Breaching Party has cured any such breach or default prior to the expiration of such [cure period]."). In contrast to these unambiguous contract provisions providing for a protected cure period, the provision at issue here appears to be subject to differing interpretations.

Considering the circumstances as a whole and given the conflicting plausible interpretations, the Court concludes that Apex has not met the high burden of showing a substantial likelihood of success to justify an ex parte temporary restraining order. The Court does not issue an opinion on the ultimate resolution of the question, which should be resolved after full briefing and not under an emergency-motion timetable.

### B.     Substantial Threat of Irreparable Injury

Apex argues that the disruptions to its business resulting from Starnik's refusal to reinstate Apex's access to the licensed software pose a substantial threat of irreparable injury. In its brief, Apex points to financial damages and the loss of its customers' good will as evidence of its claim to a substantial threat of irreparable injury. *See* Plaintiff's Brief at 12–13.

The monetary nature of a movant's asserted injuries, however, weighs heavily against a claim of irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Morgan*

v. *Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975). A court will not find irreparable harm unless the movant can show that the loss cannot be measured in money damages. *Millennium Restaurants Grp., Inc. v. City of Dallas, Texas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001) (Fish, J.) (citing *Hardin v. Houston Chronicle Publishing Company*, 426 F. Supp. 1114, 1117–18 (S.D. Tex. 1977), *aff'd*, 572 F.2d 1106 (5th Cir.1978)).

The Fifth Circuit has held that a relatively new business's loss of good will "is usually compensable in money damages." *DFW Metro Line Services v. Southwestern Bell Telephone Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990). Later cases have extended this principle to established businesses. A district court held that "losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm." *Sun Water Sys., Inc. v. Vitasalus, Inc.*, No. CIV.A. 4:05-CV-574-Y, 2007 WL 820280, at *6 (N.D. Tex. Mar. 8, 2007) (Means, J.). This principle holds true even if "the pecuniary injury [is] difficult to calculate." *Id.* (quoting *Millennium Restaurants Grp.*, 181 F. Supp. 2d at 666).

Apex has not shown that monetary damages would be inadequate to compensate it for the claimed loss of customers and good will. The "[l]oss of business is plainly calculable." *Fucich Contracting, Inc. v. Shread-Kuyrkendall & Assocs., Inc.*, No. CV 18-2885, 2018 WL 7198176, at *3 (E.D. La. Dec. 10, 2018). If Apex were to prevail on the merits, the Court could award monetary damages for lost business in the amount of the difference between Apex's book of business before Starnik barred Apex's access to the licensed software and after Starnik's alleged breach has ended.

Moreover, the loss of good will is generally compensable through monetary damages, and this is especially so when there is a short time period during which good will

10

is lost. *See TRAVELHOST, Inc. v. Figg*, No. 3:11-CV-0455-D, 2011 WL 6009096, at *4 (N.D. Tex. Nov. 22, 2011) (Fitzwater, C.J.); *accord Texas Marine & Brokerage, Inc. v. Bennington Marine, LLC*, No. 1:12-CV-397, 2012 WL 12888827, at *5–6 (E.D. Tex. Oct. 17, 2012), *report and recommendation adopted*, No. 1:12-CV-397, 2012 WL 12892168 (E.D. Tex. Nov. 9, 2012).

The only authority that Apex cites in support of its contention that the loss of business and good will constitutes irreparable harm, *CompuCom Sys., Inc. v. WJ Glob.*, LLC, No. 3:14-CV-3625-L, 2014 WL 12531270 (N.D. Tex. Oct. 23, 2014), is inapposite. First, the evidence presented in that case clearly established that the defendant "prematurely terminated the parties' agreement in violation of the agreement." *Id.* at *1. Here, in contrast, the parties' conduct, the contractual provisions, and the resulting liability are less certain. Moreover, the plaintiff in *CompuCom* established a substantial threat of irreparable harm because substantial liens and demands by the defendant and the defendant's subcontractors were being made against the plaintiff's clients and customers. *Id.* at *2. Here, Apex has not shown a similar substantial threat of irreparable injury. Notably, the defendant in *CompuCom* "did not file a response to Plaintiff's Motion for a Preliminary Injunction" and "had no contact, verbal or written, with the court." *Id.* at *2. Here, however, Starnik has not failed to comply with court orders and has had no opportunity to be heard in this Court. In sum, *CompuCom* does not establish that Apex can meet its substantial burden to obtain an ex parte temporary restraining order.

Moreover, Apex has notably not pled facts or otherwise explained why it could not mitigate the harm that Starnik's alleged breach poses by obtaining similar services from another software licensor. Although Apex claims that it is "unable to continue its business

operations without access to the Starnik-licensed software," Plaintiff's Brief at 13, it does not explain why alternative software products would be deficient. Correspondence between the parties demonstrates that Apex has requested that Starnik prepare a final back-up of Apex's data, pursuant to Section 5(D) of the Agreement. *See* Plaintiff's Brief, Ex. C. Accordingly, it appears that Apex has taken steps to prepare for alternative services, which would be unsurprising given that Apex arguably breached the Agreement with Starnik by undertaking to consummate the business transaction with Conservice and the alleged cure period lasts only 21 days. Alternative software services could mitigate any possibility of irreparable harm to Apex. The Court would require additional information concerning the deficiency of the alternative software licensors that are available to Apex before entering preliminary injunctive relief.

Finally, Apex argues that Starnik's alleged breach poses a threat of irreparable harm to its customers, who are consequently unable to comply with their own legal requirements. Apex, however, has not pointed to authority that allows it to assert the interests of its customers in an application for a temporary restraining order. Another district court concluded that a business lacks standing to assert the interests of its customers in a motion for preliminary injunctive relief. *See Hospice Advantage, LLC v. St. Joseph Hospice, LLC*, No. 5:13-CV-56-KS-MTP, 2013 WL 12108219, at *1 (S.D. Miss. Apr. 12, 2013).

Because Apex has not adequately alleged that the disruption to its business cannot be remedied by monetary damages, Apex has failed to demonstrate a substantial threat of irreparable harm.

4. **Conclusion**

For the foregoing reasons, the Court denies Apex's motion for an ex parte temporary restraining order.

SO ORDERED this 20th day of August, 2019.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE